**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00041 (APM)** |
| **v.** | : | |
| | : | |
| **PAUL LEE SEYMOUR, SR.,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Paul Lee Seymour, Sr. to 90 days of home detention, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Paul Lee Seymour, Sr. ("Seymour Sr."), age 61 years, and his son, codefendant Paul Lee Seymour, Jr. ("Seymour, Jr."), jointly participated in the January 6, 2021, attack on the United States Capitol — a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.

Seymour Sr. pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence that includes 90 days of home detention and 36 months' probation is appropriate in this case because he and his son: (1) arrived on the grounds of the Capitol building when violent activity was taking place around the Capitol and observed that activity; (2) looked for an entrance to the Capitol on the West Front and observed police officers were kicking people

out of the building, rather than letting people in, and pepper-spraying rioters to keep them from coming into the building and engaging in violence; (3) stood amongst a mob of rioters on the west plaza that repeatedly chanted, "Police stand down;" (4) entered the Capitol through the Senate Wing Doors with other rioters at approximately 3:08 p.m.; (5) traveled inside the Capitol to the Crypt and Statutory Hall, where they took photographs and posed for at least one photograph taken by another rioter; (6) left the Capitol at approximately 3:33 p.m., after they were told to exit the building through the Chestnut-Gibson Memorial Doors, a significant distance away from the point of entry at the Senate Wing doors; and (7) stayed on the Capitol grounds for hours, despite efforts by police office to clear rioters, including the Seymours, from the grounds of the Capitol.

Even though he did not personally engage in violence or property destruction during the riot, the Court must consider that Seymour Sr.'s conduct on January 6, like the conduct of thousands of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who tried to prevent a breach of the Capitol building, limit access to the Capitol building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who

were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of 90 days' home detention both necessary and appropriate. Furthermore, the aggravating factors above explain why probation only is not warranted in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 10 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions — from the most mundane to the most violent — contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Seymour Sr.'s conduct and behavior on January 6th.

*Defendant Paul Lee Seymour, Sr.'s Role in the January 6, 2021 Attack on the Capitol*

On or about January 5, 2021, the Seymours traveled together from Ohio to Washington, D.C. to attend the "Stop the Steal" rally at the Ellipse near the White House. After attending the rally, the Seymours walked to the United States Capitol Building.

At approximately 2:03 p.m.,  police officers clad in riot gear were engaged with members of a mob, some of whom were assaulting the officers, on the West Front of the U.S. Capitol Building. The United States Capitol Police had also set up amplification equipment that repeatedly broadcast an order commanding the crowd to disperse. In conjunction with that amplified recording, law enforcement was deploying crowd control munitions against the mob. Various surveillance and open-source intelligence (OSINT) images and videos of the West Front

of the Capitol from around the time that the Seymours arrived at the Capitol at approximately 2:40 p.m. and attempted to gain entry.

Image 1 shows the massive crowd of rioters on the West Front of the Capitol.  At approximately 2:42 p.m., at the Parliamentarian's Door, police officers were kicking rioters who had entered out of the Capitol and pepper-spraying other rioters outside the building to keep them from entering into the building. The Parliamentarian's Door is identified with a red arrow in Image 2. The Senate Wing Doorway – the first breach point of the Capitol and the two windows flanking it can be seen in the background just above the heads of the rioters and behind the flags at the center of Image 2 – is in close proximity to the Parliamentarian's Door.

Image 1

Image 2



01/06/2021 19:42:29

As the Seymours stood on the west plaza, the rioters surrounding them repeatedly chanted, "Police stand down."  Image 3 is a screenshot of a video of activity on the west plaza recovered from a publicly available video; the Seymours are encircled in red.  See Image 3 and Video Exhibit 1.[1]

---

[1]   The video can be found at https://d2hxwnssq7ss7g.cloudfront.net/S3xTtPUyKMam_cvt.mp4.

Image 3



As mentioned in the Statement of Offense, the Seymours entered the Capitol building through the Senate Wing Doors at approximately 3:08 p.m.  Image 4 shows Seymour Jr. (circled in red) as he and Seymour Sr. approached the Senate Wing Door at approximately 3:08 p.m. and Image 5 shows both Seymour Jr., followed by Seymour Sr. (both circled in red in these and some of the following images), entering the Capitol through the Senate Wing Door at approximately 3:09 p.m.

Images 4 and 5





As shown in Images 4 and 5, Seymour Jr. wore a red baseball-style cap, black overalls, and a white hooded jacket. He also carried a Trump flag. Seymour Sr. wore a grey knit cap and a black or dark-colored jacket.

Once inside the Capitol, the Seymours traveled to the Crypt. They were captured by surveillance camera video, as shown in Image 6, and also posed for a photograph taken by another rioter, as shown in Image 7.

Images 6 and 7





At approximately 3:32 p.m., the Seymours were ordered by police officers to exit the Capitol and were directed to the Chestnut-Gibson Memorial Doors. As shown in Images 8 through13,  the Seymours complied with the officers' orders and exited the building at approximately 3:33 p.m. As shown in Image 12, Seymour Jr. exulted as he left the buildling.

Images 8-10







Images 11-13







While the Seymours exited the Capitol on the east side of the building, they had entered the building on the west side and spent almost 30 minutes parading through the building at will. Once outside, the Seymours remained on the grounds of the Capitol and returned to the west side of the building. Seymour Jr. joined with other rioters on the Upper Terrace at approximately 4:35 p.m. and raised the Trump flag that he carried with him on January 6. See Image 14.

Image 14



After it had grown dark in Washington, D.C. on January 6, the Seymours finally left the restricted grounds of the Capitol. Seymour Jr. posed for a photograph taken of himself in front of a line of police officers who had formed a perimeter outside the Capitol. See Image 15.

Image 15



*Seymour Sr.'s Voluntary Interview with the FBI*

On June 2, 2021, Seymour Sr. gave a voluntary interview to the FBI. During the interview, he admitted to traveling to Washington, D.C. with his son to attend the rally and then to go to the Capitol.

Seymour Sr. described going to the Capitol and witnessing the mob, including individuals breaking windows. He admitted that he and his son entered the Capitol through an open side entry door, then were forced to leave through that same door by police officers.[2]  While exiting

---

[2]        Seymour Sr.'s statement suggests that he and Seymour Jr. first entered the Capitol through the Parliamentarian's door, which was breached at approximately 2:42 p.m. and approximately two minutes after their arrival on the west front of the Capitol.  The Parliamentarian's Door is a short distance away from the Senate Wing Doors.  Seymour Jr., in his own voluntary interview, stated that rioters were thrown out of a "side door" to the Capitol. Arguably, the Parliamentarian's door, which was not a typical entry point to the Capitol, was a "side door."  He added that as he and Seymour Sr. prepared to leave the "courtyard," he noticed a doorway approximately 40 feet away that was open and that they entered the Capitol through that doorway.  Again, the Parliamentarian's door is a short distance from the Senate Wing Doors. While the government found no evidence of the Seymours' entry to the Capitol through the

through that doorway, Seymour Sr. stated that he and his son saw another open door and followed the crowd into that doorway, meaning the Senate Wing Doors.

Once inside the Capitol, Seymour Sr. recalled him and his son entering into a room with multiple statues and took photographs. He believed that they were inside the Capitol for only nine minutes before police officers arrived and escorted them out of the building.  He also stated that he and his son remained on the grounds of the Capitol and took additional photographs. He did not post any photographs or messages on social media.

*The Charges and Plea Agreement*

On December 3, 2021, Seymour Sr. was charged in Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On December 7, 2021, he voluntarily turned himself into law enforcement agents in Ohio for booking. On February 3, 2022, the United States charged Seymour Sr. in a four-count Information with violating the same four offenses. On July 14, 2022, pursuant to a plea agreement, Seymour Sr. pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Seymour Sr. agreed to pay $500 in restitution.

## III.    Statutory Penalties

Seymour Sr. now faces sentencing for the single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Seymour Sr. faces up to six months of imprisonment and a fine of up to $5,000. Seymour Sr. must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

Parliamentarian's door, there is evidence of their entry through the Senate Wing Doors shortly after 3:00 p.m.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 90 days of home detention, 36 months' probation, 60 hours of community service, and $500 in restitution.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Seymour Sr.'s individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors,

including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Seymour Sr. personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Seymour Sr. is therefore not a mitigating factor in misdemeanor cases.

Seymour Sr. walked through the mob on the west front of the Capitol to get to the plaza area. He witnessed clashes with police and rioters breaking the Capitol building's windows.  He stood amidst rioters repeatedly chanting, "Police stand down."  He saw rioters being thrown out of the Capitol. He also saw police officers' attempt to deter the rioters by deploying pepper-spray. Undeterred, Seymour Sr. and his son followed other rioters into the Capitol through the broken Senate Wing Doors.

Once inside the Capitol, Seymour Sr. and his son, the latter carrying a large Trump sign, paraded into the Crypt and took photographs for approximately 30 minutes until they were ordered to leave by police officers.  While they complied with the officers' orders, they did not leave the grounds of the Capitol until much later, specifically, after it got dark in Washington, D.C.

When confronted with his January 6 conduct, Seymour Sr. admitted to the FBI that he had entered the U.S. Capitol.  He immediately accepted early responsibility for his actions and participation in the riot. Seymour Sr.'s counsel quickly informed the government that he would accept the plea offer provided by the government.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence to include 90 days of home detention and 36 months' probation.

### B.  The History and Characteristics of Seymour Sr.

Seymour Sr. is a 61-year-old man with three living adult children. *See* ECF 27 ("Presentence Report" or "PSR") ¶¶ 31-32.  The defendant completed eleven years of high school and earned his General Education Diploma. PSR ¶ 41.  From 2005 to August 10, 2022, the date of his retirement, the defendant was employed as a truck driver.  *Id*. at ¶¶ 42-43. As set forth in the PSR, the defendant does not have a criminal history. *Id*. ¶¶ 25-31.  He does not appear to have a drug or alcohol problem. *Id*. ¶¶ 39-40. The PSR does not suggest that the defendant was mentally and/or emotionally incapable of avoiding his criminal conduct; instead, he chose to engage in criminal conduct. *Id*. at ¶ 38.

Seymour Sr. admitted that he entered the Capitol on January 6.  He has been compliant with the conditions of pretrial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

> But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again.

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

(Statement of Judge Walton at sentencing hearing), *United States v. Mariposa Castro,*

1:21-cr-00299, Tr. 2/23/2022 at 41-42.

General deterrence is an important consideration because many of the rioters, including

Seymour, Sr., intended that their attack on the Capitol would disrupt, if not prevent, one of the

most important democratic processes we have: the peaceful transfer of power to a newly elected

President. As noted by Judge Moss during the sentencing hearing in *United States v. Paul*

*Hodgkins*, 21-cr-188-RDM,

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [[Defendant Last Name]] and others caused that day goes way beyond the several-
> hour delay in the certification. It is a damage that will persist in this country for
> decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See United States*

*v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment

rights.") (statement of Judge Moss). And it is important to convey to future potential rioters —

especially those who intend to improperly influence the democratic process — that their actions

will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Seymour Sr.'s lack of criminal record, his acceptance of responsibility and quick surrender

to authorities suggest that incarceration  is not necessary to deter him from future criminal activity.

However, by responding to witnessing violence at the Capitol, the breaking of windows and chanting of "Police stand down," at the same time that police were being overwhelmed by the mass of rioters and using methods to deter the crowd, by entering into the Capitol suggests that some period of home detention is warranted.  The recommended sentence will hopefully serve to press upon Seymour Sr. and others like him cannot illegally stomp upon a legitimate democratic process and fail to abide by the principals and law that holds this country together.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Seymour Sr. based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot. Although those like Seymour Sr. convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[5]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Seymour Sr. has pleaded guilty to Count One of the Information, charging him with one count of violating 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The sentences in those cases differed substantially from one another. But that range of sentences illustrates that, for Section 5104 violations were the entire statutory range is only six months, any sentence in that range cannot create an unwarranted disparity.

The Court in *United States v. John Juran,* 1:21-CR-419 (TFH) sentenced the defendant to 60 days' home detention.  Like Seymour Sr., Juran witnessed individuals shoving and overtaking law enforcement officers on the West Front of the Capitol. He followed other rioters into the Parliamentarian's Door after it was breached. He remained inside the Capitol for approximately 10 minutes and left when he was ordered to do so by police officers. Juran cooperated with the FBI and admitted that he had entered the Capitol.  Juran had no prior convictions.  Juran spent

less time in the Capitol than Seymour, Sr. but unlike Seymour, Sr., Juran deleted photographs and videos that were stored on his mobile telephone and depicted events on January 6.

In *United States v. Caleb Jones*, (1-21-CR-321 (JEB)), the government recommended a sentence of 90 days home detention and Judge Boasberg sentenced Jones to 60 days. Jones was in the Capitol for approximately 15 minutes, took videos while inside, and scaled a wall to gain access to gain access to the building.

In *United States v. Kostolsky*, (1-21-CR-197 (DLF)), the defendant scaled a wall to get to the Upper West Terrace after he saw others doing the same, entered the Capitol through the Parliamentarian doors breached by rioters only 30 seconds earlier, remained inside for approximately 10-13 seconds but left after Capitol police yelled "get out." Kostolsky proudly texted friends that he scaled the wall, got tear gassed, and "caught a rubber bullet." He first denied entering the Capitol when talking to the FBI, but then later admitted he went in. The government recommended 30 days' incarceration and Judge Friedrich sentenced him to 30 days' of home detention.

In *United States v. Michael Stepakoff*, (1-21-CR-96), the defendant claimed he did not know he couldn't be in the Capitol despite being a lawyer who practiced criminal law for over a decade. He entered the Capitol as others climbed through broken windows around him. He also spread misinformation on social media glorifying the events of January 6, 2021. The government recommended 14 days' incarceration. Judge Contreras sentenced Stepakoff to 60 days' home detention.

In *United States v. John Wilkerson, IV*, (1-21-CR-302 (CRC)), the defendant was in the Capitol for approximately 20 to 25 minutes. He had limited social media posts after January 6 indicating a lack of remorse. The government requested a sentence of two months' home

detention and 36 months' probation. Judge Cooper sentenced Wilkerson to 36 months' probation.

In *United States v. Sizer*, (1-21-CR-621 (CRC)), the defendant was inside the Capitol for approximately two minutes. She lied to the FBI about going in and she did not have any social media posts or a criminal history. The government recommended a sentence of two months' home detention and 36 months' probation. Judge Cooper sentenced Sizer to 12 months' probation and a $5,000 fine.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Seymour Sr. to 90 days of home detention, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Anita Eve*
Assistant United States Attorney
PA Bar No. 45519

## <u>CERTIFICATE OF SERVICE</u>

On this 24th day of October 2022, a copy of the foregoing was served upon all parties listed

on the Electronic Case Filing (ECF) System.

<u>/s/ Anita Eve</u>
Assistant United States Attorney